# EXHIBIT 3

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF NEW YORK
 3     - - - - - - - - - - - - - - - X
 4     DBW PARTNERS, LCC d/b/a/ THE     :
 5     CAPITOL FORUM,                   :
 6         Plaintiff,                   :   Civil Action No.
 7              v.                      :   1:24-cv-09836-LGS
 8     BTG PACTUAL ASSET MANAGEMENT     :
 9     US, LCC,                         :
10         Defendant.                   :
11     - - - - - - - - - - - - - - - X
12                              Washington, D.C.
13                              Tuesday, July 1, 2025
14          Videotaped deposition of THEODORE "TEDDY"
15     DOWNEY, an individual and Rule 30(b)(6) witness
16     herein, called for examination by counsel for
17     Defendant in the above-entitled matter, pursuant to
18     notice, the witness being duly sworn by MARY GRACE
19     CASTLEBERRY, a Notary Public in and for the District
20     of Columbia, taken at the offices of Troutman Pepper
21     Locke, 401 9th Street, N.W., Washington, D.C., at
22     10:02 a.m., Tuesday, July 1, 2025, and the
```

**Page 2**

1 proceedings being taken down by Stenotype by MARY
2 GRACE CASTLEBERRY, RPR, and transcribed under her
3 direction.

**Page 3**

APPEARANCES:

On behalf of the Plaintiff DBW Partners d/b/a The Capitol Forum:
    JOHN B. WILLIAMS, ESQ.
    jbwilliams@hartylawgroup.com
    Harty Williams
    1629 K Street, N.W.
    Washington, D.C. 20006
    (202) 277-8435

On behalf of Defendant BTG Pactual Asset Management US, LLC:
    RYAN E. DORNBERGER, ESQ.
    ryan.dornberger@troutman.com
    Troutman Pepper Locke LLP
    600 Travis Street, Suite 2800
    Houston, Texas 77002
    (713) 226-1200

ALSO PRESENT:
    ORSON BRAITHWAITE, Videographer

**Page 4**
C O N T E N T S

| WITNESS | EXAMINATION BY COUNSEL FOR DEFENDANT | |
|---|---|---|
| THEODORE "TEDDY" DOWNEY | | |
| BY MR. DORNBERGER | | 7 |
| BY MR. DORNBERGER - Rule 30(b)(6) | | 101 |

E X H I B I T S

| EXHIBIT | | PAGE |
|---|---|---|
| NO. 1 | July 6, 2017 email from Teddy Downey to Trevor Baine, TCF000931 | 41 |
| NO. 2 | December 21, 2017 email from David Witkin to Teddy Downey, TCF000934 | 49 |
| NO. 3 | April 25, 2023 email from Teddy Downey to Jake Williams, TCF000016 | 59 |
| NO. 4 | April 25, 2023 email from Teddy Downey to Jake Williams, TCF000018 | 66 |
| NO. 5 | April 25, 2023 email from Teddy Downey to Jake Williams, TCF000021 | 71 |
| NO. 6 | April 19, 2023 email from Joseph Alba to Jake Williams, TCF000028 | 82 |

**Page 5**

E X H I B I T S (Continued)

| EXHIBIT | | PAGE |
|---|---|---|
| NO. 7 | April 19, 2023 email from Joseph Alba to Jake Williams, TCF000033 | 86 |
| NO. 8 | Capitol Forum's Response to BTG Pactual's First Set of Interrogatories (Nos. 1-14) | 102 |
| NO. 9 | Capitol Forum's Supplemental Response to BTG Pactual's Interrogatories 1 and 13 | 102 |
| NO. 10 | Defendant BTG Pactual Asset Management US, LLC's Second Set of Interrogatories to Plaintiff (Nos. 15-20) | 102 |
| NO. 11 | Capitol Forum article dated January 17, 2017, TFC000913 | 114 |

2 (Pages 2 - 5)

**Page 6**

1  P R O C E E D I N G S
2      THE VIDEOGRAPHER: Good morning. We are
3  going on the record at 10:02 a.m. on July 1st, 2025.
4  Please note that the microphones are sensitive and
5  may pick up whispering and private conversations.
6  Please mute your phones at this time. Audio and
7  video recording will continue to take place unless
8  all parties agree to go off the record.
9      This is media unit 1 of the video recorded
10 deposition of Mr. Teddy Downey in the matter of DBW
11 Partners, LLC, et al. versus BTG Pactual Asset
12 Management filed in the United States District Court
13 for the Southern District of New York, Civil Action
14 Number 1:24-cv-09836-LGS.
15     My name is Orson Breathwaite representing
16 Veritext Legal Solutions and I'm the videographer.
17 The court reporter is Mary Grace Castleberry from the
18 firm Veritext Legal Solutions.
19     Will counsel now state their appearances
20 and affiliations for the record beginning with the
21 noticing attorney.
22     MR. DORNBERGER: Good morning. This is

**Page 7**

1  Ryan Dornberger from Troutman Pepper Locke on behalf
2  of the defendant, BTG.
3      MR. WILLIAMS: John Williams for
4  plaintiff.
5      THE VIDEOGRAPHER: Thank you. Will the
6  court reporter please swear in the witness.
7  Whereupon,
8          THEODORE "TEDDY" DOWNEY,
9  was called as a witness by counsel for Defendant, and
10 having been duly sworn by the Notary Public, was
11 examined and testified as follows:
12     EXAMINATION BY COUNSEL FOR DEFENDANT
13 BY MR. DORNBERGER:
14   Q.  Good morning, Mr. Downey.
15   A.  Good morning.
16   Q.  Can you please state your full name for
17 the record?
18   A.  Theodore Downey.
19   Q.  Have you ever been deposed before?
20   A.  No.
21   Q.  There's a couple of ground rules I'll give
22 you here at the start. The most important one is the

**Page 8**

1  court reporter here can only take down things when
2  we're speaking one at a time. And oftentimes in
3  normal conversation, we try to finish each other's
4  sentences in our heads and speed the conversation
5  along. I want you to try not to do that today. I
6  will do the same. I will wait until you've
7  completely finished answering your question -- my
8  question before asking the next question. We may
9  trip up but we'll try to not speak over each other
10 today, okay?
11   A.  Yeah.
12   Q.  Next, the videographer obviously is taking
13 video. If at any time you want to take a break, this
14 isn't a sprint, more like a marathon, happy to take a
15 break. Just let me know. I would only ask that you
16 finish answering whatever question I've asked before
17 we take that break.
18     Is there any reason you can't tell the
19 truth today?
20   A.  No.
21   Q.  What is your background? Did you go to
22 college?

**Page 9**

1   A.  I went to college.
2   Q.  Where did you go?
3   A.  I went to Columbia University.
4   Q.  And what did you study?
5   A.  English.
6   Q.  When did you graduate from Columbia?
7   A.  2004.
8   Q.  What was your first job out of undergrad?
9   A.  I, you know, had a couple of odd jobs but
10 I worked on the Kerry/Edwards campaign in advance,
11 setting up events.
12   Q.  How long did you do that?
13   A.  Until the election, so from graduation
14 until election.
15   Q.  What did you do next?
16   A.  I tried to get a series of internships.
17 You know, one was at an advertising firm and one was
18 at a polling firm.
19   Q.  Did you actually get any of those
20 internships?
21   A.  Yeah, no, I got -- yeah, I tried and got
22 two internships.

Page 18

```
 1   Q.   So you were the one that first came up
 2  with the idea of founding Capitol Forum?
 3   A.   Yes.
 4   Q.   And how did Jake and Trevor respond to
 5  that?
 6   A.   They said okay.
 7   Q.   What year approximately did you found
 8  Capitol Forum?
 9   A.   I got a notification in my LinkedIn that
10  it's been 13 years.
11   Q.   So that was approximately 2012?
12   A.   Yes.
13   Q.   Do you recall about how many employees you
14  started with?
15   A.   Employees, uh, two maybe.  I mean, one at
16  a time I think.
17   Q.   What were you doing when you first started
18  Capitol Forum?  What was your job?
19   A.   I would write with the team.
20   Q.   And what topics were you generally writing
21  about?
22   A.   When we started Capitol Forum, one of the
```

Page 19

```
 1  things we really wanted to focus on was monopoly and
 2  antitrust so primarily we would write about mergers.
 3   Q.   How did you come up with the topics that
 4  you would write about when you first started Capitol
 5  Forum in 2012?
 6   A.   Well, mergers are really easy to figure
 7  out which ones are going on because they're public,
 8  publicly announced.
 9   Q.   Is that it?  You would just look at the
10  public mergers?
11   A.   Yeah, for the most part.
12   Q.   Who were the clients of Capitol Forum in
13  2012?
14   A.   We didn't have that -- well, we were
15  targeting merger arb investors.
16   Q.   Is there a reason you were specifically
17  targeting merger arb investors?
18   A.   Well, part of the business plan was to
19  focus on monopoly and it is, you know, I would say
20  when you're writing about monopoly and mergers, some
21  of -- the customers that really want to pay for that
22  are merger arb investors.  So it made sense to, you
```

Page 20

```
 1  know, target that audience to, you know, try to sell
 2  subscriptions.
 3   Q.   Do you know what these merger arb
 4  investors would do with Capitol Forum's research?
 5   A.   They would bet on mergers or they would
 6  use it to inform their bets on mergers.
 7   Q.   Do you recall approximately how many
 8  subscribers Capitol Forum had in 2012?
 9   A.   You mean after a year of operation?
10   Q.   Sure.
11   A.   I have no idea.  I do not remember.
12   Q.   How many subscribers does Capitol Forum
13  have today?
14   A.   I should know that.  Several hundred.
15   Q.   There weren't nearly that many subscribers
16  back in 2012, were there?
17   A.   No.
18   Q.   How many employees does Capitol Forum have
19  today?
20   A.   About 50.
21   Q.   And what is your current job
22  responsibilities?
```

Page 21

```
 1   A.   I am the CEO and the executive editor.
 2   Q.   How do you spend most of your time?
 3   A.   Managing people, managing reporters.
 4   Q.   Okay.  Walk me through that.  If you're
 5  managing a reporter, are you suggesting topics?  Are
 6  you reviewing drafts?  What are you doing?
 7   A.   I have a weekly conference call with the
 8  people that are on my team.  I have regular
 9  conference calls with other heads of other parts of
10  the business, the cofounders, the head of the
11  European team.  I'm in email dialogue with the head
12  of my corporate investigations team and I regularly
13  review drafts and make strategic suggestions for the
14  people on my -- that directly report to me on my
15  antitrust conduct team.
16   Q.   How many reporters does Capitol Forum have
17  today?
18   A.   35-ish.
19   Q.   Are you managing all 35 of those?
20   A.   No.
21   Q.   How many are you specifically supervising?
22   A.   Well, there's some shared responsibility
```

6 (Pages 18 - 21)

```
 1  on Exhibit 1, right?
 2     A.  It's there, sure.  I just don't remember
 3  it.  It's eight years ago.
 4     Q.  Sure.  And today, do you know anybody
 5  personally over at ▓▓▓▓▓▓▓
 6     A.  We have subscribers there.
 7     Q.  Do you know anybody personally?
 8     A.  I'm sure I do but I can't give you their
 9  name off the top of my head.  There are different
10  pods at ▓▓▓▓▓▓ with different names.  I'm sure I
11  know a handful of people there.
12     Q.  What kind of company is ▓▓▓▓▓▓
13     A.  It's a hedge fund but they do other stuff
14  too, but my experience with them is as a hedge fund.
15     Q.  Okay.  Here at the very bottom of your
16  email on Exhibit 1, you say, "I'm getting pretty
17  annoyed at how easy it is for Wall Street to steal
18  our stuff at this point," right?
19     A.  Yes.
20     Q.  Do you remember writing that?
21     A.  No, but it's here.
22     Q.  Do you agree with the sentiment here in
                                                Page 46
```

```
 1  your email?
 2     A.  I agreed eight years ago before we sued --
 3  threatened to sue ▓▓▓▓▓▓▓▓ sued Bloomberg, and
 4  then sued your client and Market Securities.  I don't
 5  worry about this anymore as much because people know
 6  that if they violate our copyright, we will sue them.
 7  So I don't feel this way anymore.
 8         Now, I certainly would if it were true.
 9  You know, our growth has been consistent.  I would
10  certainly -- if this was presented to me now like it
11  was eight years ago, I would be very upset, I'm sure,
12  but I don't -- this is not my experience with how the
13  business operates now.
14     Q.  You said if growth was consistent, and I'm
15  just not sure what you meant by that.  Are you saying
16  now growth is consistent?
17     A.  When we experience periods of time when
18  there was a subscriber or third party that is
19  persistently violating our copyright, we notice
20  retrospectively that, oh, that can explain periods of
21  slower growth.  I would say typical for us is 15 to
22  20 percent growth.  When someone is systematically
                                                Page 47
```

```
 1  violating our copyright, that can be lower, flat,
 2  5 percent, 10 percent.
 3         So they're historically connected.  And
 4  so, like I said, I don't feel that it's easy for Wall
 5  Street to steal our stuff anymore.  We put in place a
 6  very good system to, you know, try to prevent this.
 7  You can't completely prevent it, obviously.  There --
 8  if someone really wants to violate copyright, they
 9  can do it.  But, you know, this email says, you know,
10  we wanted to make it hard, which we did, or painful
11  if you get caught.
12     Q.  Okay.  You said you put in place a very
13  good system to try and prevent this sharing and I
14  just want to make sure we're talking about the same
15  thing.  What system is that?
16     A.  We have our distribution system which,
17  like I said, entails a watermark, entails a secure
18  platform, you know, the tech team, Jake in particular
19  has implemented measures to make it, you know, harder
20  to print the screen, harder to do little things.
21         Now, there is always a trade-off in terms
22  of being able to access the article or make it more
                                                Page 48
```

```
 1  secure.  You can't make it so unwieldy to access.
 2  There is a tension there sometimes.  But we've done a
 3  number of things, we -- on the technology side to
 4  make it harder -- there's different ways to track as
 5  well.  That is in the software.  We have retained
 6  John Williams subsequently to vigorously pursue
 7  copyright infringement and to consult with us about
 8  how to make sure that we are getting to the bottom of
 9  it.
10         And it's a system that works, as I said.
11  Prior to bringing on John Williams, you know, we had
12  a lawyer that did the ▓▓▓▓▓▓▓▓ stuff and the stuff
13  prior to Bloomberg, but having someone who will do a
14  thorough investigation and, you know, help us with
15  our litigation strategy has -- and has been very
16  successful for us in deterring stealing.
17         I believe that there are emails to that
18  effect about -- of your client or Market Securities
19  or other subscribers noting our litigiousness and our
20  vigorous defense of our copyright and their lack of
21  willingness to forward things.
22         (Exhibit No. 2 was marked for
                                                Page 49
```

13 (Pages 46 - 49)

```
 1  forwards it on to Nate and then you get it from Nate,
 2  right?
 3      A.  Correct.
 4      Q.  Is there anything particularly interesting
 5  about this email from Market Securities that caught
 6  your attention?
 7      A.  Well, I'm just going to go on this email
 8  and the past one, how little I care about this
 9  because, you know, not in little I care about it.
10  It's just not relevant to my work personally.
11          This is just not relevant to me so
12  that's -- I'm like what is Market Securities?  You
13  know, and the last one, I didn't even respond.  So I
14  don't -- I just don't know.  My interaction with this
15  is who is this, who are these people.  It's a normal
16  reaction from the executive editor.
17      Q.  And at this point in 2020, were you
18  focused on mergers as an editor?
19      A.  I -- you know, I'm always a little bit
20  interested.  I don't remember this at all so, you
21  know, maybe -- you know, under normal circumstance,
22  if I were caring about this, I could say, well, it's
```
Page 70

```
 1  there?
 2      A.  I think that's a different number, 000024
 3  and 25?
 4      Q.  Right.  So the first page is 21.
 5      A.  Got it.
 6      Q.  And pages 4 and 5 are 24 and 25?
 7      A.  I got it.  Yeah, I'm there.
 8      Q.  So you see there is an email that starts
 9  this thread from ▮▮▮▮▮▮▮▮ on Monday,
10  October 25th, 2021, right?
11      A.  Yeah.
12      Q.  And that's to you and Mr. Treacy, right?
13      A.  Yes.
14      Q.  And what did ▮▮▮▮▮▮▮ email you?
15      A.  He said, "You did not get this from me but
16  wanted to make you aware Market Securities, a broker
17  focused on merger arb, posts summaries of CapForum
18  reports.  Their summary of AJRD today is really
19  specific and detailed.  I know CapForum has put in
20  real effort to dissuade" privacy -- piracy -- "to
21  dissuade piracy so I thought you'd want to know."
22      Q.  And do you know ▮▮▮▮▮▮▮
```
Page 72

```
 1  interesting that Market Securities is in the same
 2  competitive space.  But obviously I was not aware of
 3  that until this email.
 4          MR. DORNBERGER:  Okay, Mr. Downey, we've
 5  been going for about -- almost an hour.  So why don't
 6  we take another 10-minute break and we can continue.
 7          MR. WILLIAMS:  Okay.
 8          THE VIDEOGRAPHER:  The time is 11:41 a.m.
 9  This ends unit 2.  We're off the record.
10          (Recess.)
11          THE VIDEOGRAPHER:  The time is 11:55 a.m.
12  This begins unit number 3.  On the record.
13          (Exhibit No. 5 was marked for
14           identification.)
15  BY MR. DORNBERGER:
16      Q.  Okay, Mr. Downey, you've been handed
17  what's been marked by the court reporter as Exhibit
18  Number 5.  This is a string of emails with the Bates
19  Number of the first page TCF000021, right?
20      A.  Yes.
21      Q.  Okay.  Let's just jump all the way to the
22  first email in the string on pages 4 and 5.  Are you
```
Page 71

```
 1      A.  Yes.
 2      Q.  Who is he?
 3      A.  He's an investor.
 4      Q.  And he's a CapForum subscriber?
```
[remainder of page 73 redacted]

Page 73

Veritext Legal Solutions
346-293-7000

```
 1  because of the alleged infringement by either BTG or
 2  Market Securities?
 3       A.  I don't know specifically if that was the
 4  only reason but we've had I would say -- I can say
 5  with absolute certainty that we have had significant
 6  harm to the business either by not getting new
 7  subscriptions or people cancelling because they
 8  could -- they had a means of getting it illegally,
 9  these summaries.
10       Q.  Do you know of any specific subscriber who
11  canceled because they were getting --
12       A.  I didn't --
13       Q.  Hold on.  Because they were getting
14  information from Market Securities about a Capitol
15  Forum publication?
16       A.  You would have to ask Joseph.  I do not
17  handle that type of granular rationale behind
18  cancellations.
19           (Exhibit No. 7 was marked for
20           identification.)
21  BY MR. DORNBERGER:
22       Q.  Okay, Mr. Downey, you've been handed
                                                    Page 86
```

```
 1  what's been marked Exhibit Number 7 by the court
 2  reporter.  This is another email thread.  We're going
 3  to start with the Bates Number of the first page
 4  TCF000033.  Do I have that right?
 5       A.  Yes.
 6       Q.  Okay.  And let's go to the email that
 7  starts at the middle of page 2 and goes on to page 3.
 8  This is from Mr. Treacy to several folks including
 9  you dated December 7, 2021, right?
10       A.  Yes.
11       Q.  And at a certain point in time, Capitol
12  Forum sent Market Securities a demand letter
13  regarding the alleged infringement, right?
14           MR. WILLIAMS:  Can you -- a demand letter?
15  Cease and desist?
16  BY MR. DORNBERGER:
17       Q.  Or cease and desist.
18       A.  Yes.
19       Q.  Some type of legal communication from your
20  lawyer?
21       A.  Yes.  Yes.
22       Q.  At some point, Capitol Forum sent a cease
                                                    Page 87
```

```
 1  and desist letter?
 2       A.  Correct.
 3       Q.  And I believe that was in the end of
 4  October of 2021.
 5           MR. WILLIAMS:  Yep.
 6  BY MR. DORNBERGER:
 7       Q.  So this email in December 7th of 2021 is
 8  after you sent the cease and desist?
 9       A.  Correct.
10       Q.  Can you agree with me there?
11       A.  Yes.
12       Q.  And what does Mr. Treacy say in this
13  email?
14       A.  "Hi, guys.  This is one of the guys I
15  assume was on the Market Securities distro list.
16  Seems this continues to happen however not sure if
17  this time it's from Market Securities or from someone
18  else (either a sub, another IB/BD, or another news
19  service).  I know there's not much we can do about
20  our headlines being shared (if it's from current
21  subs) however I'd be in favor of contacting all our
22  subs (maybe after the new year) and reiterating our
                                                    Page 88
```

```
 1  policy about not sharing our work or headlines with
 2  anyone outside of their firms.  I'm probing him as
 3  much as I can without sounding like a detective.
 4  I'll see if I can get him" -- "I'll see if can get
 5  him to divulge additional info on this."
 6       Q.  What is the subject of his email?
 7       A.  "Headlines still being shared."
 8       Q.  Okay.  So Mr. Treacy looks like received
 9  information from a Capitol Forum subscriber, right?
10       A.  Yes.  No, no.  No, this is -- I don't
11  think so.  I think this is a prospect who Matt is
12  trying to sell a subscription to who asked him -- oh,
13  wait.
14       Q.  Well, let me just ask a different
15  question.
16       A.  Actually, I think it's -- anyway, I think
17  it's a prospect, not a subscriber but --
```



```
                                                    Page 89
```

## Page 150

1    MR. WILLIAMS: Facts? New facts? An
2  expert report is going to be full of things. Now,
3  you've had the opportunity to ask about it. Go seek
4  your sanctions.
5    MR. DORNBERGER: If I have to come back
6  for another deposition --
7    MR. WILLIAMS: Fine, fine.
8    MR. DORNBERGER: -- the court reporter,
9  the videographer have seat fees, they have hourly
10 fees, we have travel fees to get here to D.C. We
11 offered to try to reschedule this for you to produce
12 documents. You haven't produced the documents. So,
13 yes, I will seek sanctions if I have to come back
14 here for another deposition.
15   MR. WILLIAMS: Let me be square. We've
16 produced all the documents you've asked for. You
17 hounded me all last week to produce documents. We
18 ran overtime at Capitol Forum producing documents so
19 you wouldn't have an excuse to postpone these
20 depositions. I have given you everything you've
21 asked for. All right. Thank you very much.
22   MR. DORNBERGER: Okay. Now we can go off.

## Page 151

1    THE VIDEOGRAPHER: The time is 1:37 p.m.
2  This concludes today's deposition.
3    We're off the record.
4    (Whereupon, at 1:37 p.m., the taking of
5  the instant deposition ceased.)

## Page 152

1         CERTIFICATE OF REPORTER
2  UNITED STATES OF AMERICA ) ss.:
3  DISTRICT OF COLUMBIA     )
4    I, MARY GRACE CASTLEBERRY, RPR, the officer
5  before whom the foregoing deposition was taken, do
6  hereby certify that the witness whose testimony
7  appears in the foregoing deposition was duly sworn by
8  me; that the testimony of said witness was taken by
9  me to the best of my ability and thereafter reduced
10 to typewriting under my direction; that I am neither
11 counsel for, related to, nor employed by any of the
12 parties for the action in which this deposition was
13 taken, and further that I am not a relative or
14 employee of any attorney or counsel employed by the
15 parties thereto, nor financially or otherwise
16 interested in the outcome of the action.
17 July 16, 2025
18
19         Notary Public in and for
20         The District of Columbia
21
22 My commission expires: 07/14/2026

39 (Pages 150 - 152)

```
 1                CERTIFICATE OF REPORTER

 2   UNITED STATES OF AMERICA ) ss.:

 3   DISTRICT OF COLUMBIA     )

 4        I, MARY GRACE CASTLEBERRY, RPR, the officer

 5   before whom the foregoing deposition was taken, do

 6   hereby certify that the witness whose testimony

 7   appears in the foregoing deposition was duly sworn by

 8   me; that the testimony of said witness was taken by

 9   me to the best of my ability and thereafter reduced

10   to typewriting under my direction; that I am neither

11   counsel for, related to, nor employed by any of the

12   parties for the action in which this deposition was

13   taken, and further that I am not a relative or

14   employee of any attorney or counsel employed by the

15   parties thereto, nor financially or otherwise

16   interested in the outcome of the action.

17                         _____

18

19                         Notary Public in and for

20                         The District of Columbia

21

22   My commission expires: 07/14/2026
```