[redacted]

# EXHIBIT 2

[redacted]

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

\- - - - - - - - - - - - - - - X

DBW PARTNERS, LCC d/b/a/ THE :
CAPITOL FORUM, :
Plaintiff, : Civil Action No.
v. : 1:24-cv-09836-LGS
BTG PACTUAL ASSET MANAGEMENT :
US, LCC, :
Defendant. :

\- - - - - - - - - - - - - - - X

Washington, D.C.
Monday, June 30, 2025

Videotaped deposition of JOHN "JAKE" L. WILLIAMS, a Rule 30(b)(6) witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of Troutman Pepper Locke, 401 9th Street, N.W., Washington, D.C., at 10:00 a.m., Monday, June 30, 2025, and the proceedings being

Q. Mr. Williams, the court reporter has just handed you what has been marked as Exhibit Number 1. This is BTG's 30(b)(6) deposition notice to Capitol Forum. If you could please turn to the topics. And I understand you're here to testify on almost all of these topics, is that right?
A. That's correct.
Q. Topic number 1 is the nature of plaintiff's business. Can you tell me what Capitol Forum is, what do they do?
A. Sure. We're a media company based in Washington, D.C. We specialize in merger, antitrust and corporate investigation reporting. We work with a wide client base including financial firms, law firms, regulatory agencies, universities, increasingly corporations, and we publish essentially a newsletter, about 500 to -- actually 750 times a year at this point.
Q. When did Capitol Forum start publishing articles?
A. 2012, 2012.
Q. What topics -- let's start in that 2012



time frame, what topics did Capitol Forum publish on?
A. So the same topics we're publishing on now. We started focusing on mergers. We've broadened it into antitrust, nonmerger antitrust and corporation investigations but essentially we've been publishing on the same type of topics, which is the intersection of regulatory actions and markets. It's a competition policy publication.
Q. You say you broadened it into two other topics, nonmerger antitrust and corporate investigation. Do I have that right?
A. That's correct, yes.
Q. When did you start publishing articles on nonmerger antitrust?
A. We've really done that since 2012. The focus of the newsletter was mergers initially but as we could find areas to write on, I would say we've been writing on nonmerger antitrust essentially since -- excuse me -- essentially since inception. Corporate investigations was probably closer to 2013. But really, from the founding, we've written about all those topics.



Q. Let's go back to 2012.
A. Sure.
Q. Who are your clients? And when I say you, I just want to be clear, I'm talking about Capitol Forum.
A. Yeah, understood. So financial firms, regulatory agencies and law firms. We started selling to all those groups initially. And obviously over time we've attained more and more subscribers, but those were the targets initially.
Q. In 2012, how many employees, approximately, did Capitol Forum have?
A. We started with two employees as well as the three founders. The founders are me, Teddy Downey and Trevor Baine, so our first two hires were, you know, journalists.
Q. How about today, how many employees does Capitol Forum have?
A. Close to 50.
Q. How many journalists today does Capitol Forum have?
A. Probably 35.



Q. And are all those journalists publishing on the same topics?
A. No. They are all publishing within the areas I've described but they're all responsible for different beats and sometimes, you know, two journalists will work on the same topic but we write on a lot of different beats within those three areas I defined.
Q. Yeah, and that was a poor question. My question was if they published on those three topics that we just talked about.
A. Yes.
Q. How many beats does Capitol Forum have?
A. You know, it fluctuates, of course. I would imagine at any given moment, there's close to 50, five-zero beats, maybe slightly under that. But over the course of 12 years, 13 years, we've written on hundreds and hundreds of topics.
Q. How does Capitol Forum sell its articles?
A. We sell subscriptions. We don't sell any advertising. We sell subscriptions generally to enterprises but we have individuals. You know, we

click again. But almost certainly it's a view, then a download.
Q. For this particular article, the Aon/Willis Towers Watson article, Mr. Williams, it looks like there was a lot of subscribers interested in that article. Is that fair?
A. I think that's fair, yes.
Q. Are there some articles that get more interest from subscribers than others?
A. Yes.
Q. Do you or does Capitol Forum track which articles get more views than others?
A. We have the data to track it, absolutely.
Q. Is that a metric that you -- I'm sorry. Let me ask that. Is that a metric that Capitol Forum uses to determine what articles it should publish next?
A. Surprisingly not. We tend to -- data is important but we don't use it as well as we might and we tend to write about what we think is interesting as opposed to what will drive views.
Q. Generally, Mr. Williams, how does Capitol



Forum determine what articles to publish?
A. That's the editorial team's job. Teddy Downey leads that team. He is a journalist to his core and is always trying to define what to write about. We also have senior editors responsible for dictating coverage.
Q. But as far as you're aware, trying to figure out which article will get the most views is really not one of the metrics Capitol Forum uses to decide what to publish next?
A. Surprisingly, I would say that's fair.
Q. I want to go to topic number 14 on Exhibit 1, Mr. Williams. You can put Exhibit 2 away. Topic number 14 is Capitol Forum's knowledge of its subscribers sharing confidential, proprietary or copyrighted material beyond the original recipient of the material.
And Capitol Forum has subscriber agreements with each of its subscribers, is that right?
A. That's correct.
Q. And that subscriber agreement prohibits



the subscriber from forwarding, for example, the article beyond the subscription base, is that right?
A. That's correct.
Q. But that happens, doesn't it?
A. I would say that we are adamant about stopping unauthorized forwarding, and so it happens very infrequently and if we know about it, we take steps to prevent it and stop that behavior.
Q. What mechanisms does Capitol Forum use to prevent unauthorized forwarding of the articles?
A. So with emails, we are able to decipher forwarding outside of what would be considered routine. Or let me put that differently. We are able to generally see if some sort of forwarding occurs. Now, we don't always know who it is forwarded to immediately but with the emails, you can get insight on when forwarding occurs. And we have -- we run reports on a daily basis to try to identify if unauthorized forwarding is occurring.
With the platform itself, once something is downloaded, there is really no way for us to ensure that unauthorized forwarding does not occur.



And that's why we rely on the agreements and copyright law.
Q. I want to be really specific on this email forwarding report. Can you go into a little bit more detail? Which specific email is tracked from forwarding?
A. So we track both -- to your question, whether the authentication email is forwarded or -- but also on -- it's obviously much more I think relevant but whether the -- or at least for our purposes. But whether the email that has the headline and the first paragraph is forwarded.
Q. And how does Capitol Forum track forwarding of those emails?
A. We are able to see IP opens on those emails. Now, IP doesn't give you a specific person necessarily but it can give you indicia.
Q. But that doesn't show when an email is forwarded. That only shows when somebody clicks on the link, right?
A. Yes, that's correct.
Q. Do you keep a database of IP addresses

[redacted]

Q. Okay. I asked you an original question, Mr. Williams, about what mechanisms does Capitol Forum use to ensure that articles are not forwarded. I understand we have this email forwarding report. We have the subscription agreements themselves and the copyright law. Is there any other mechanisms that Capitol Forum uses to try to determine if a subscriber is forwarding articles?
A. No.
Q. Okay, Mr. Williams, we've been going for about 40 minutes so why don't we take our first 10-minute break.
A. Sure. I'm good.
THE VIDEOGRAPHER: The time is 10:37 a.m. This ends unit 1. We're off the record.
(Recess.)
THE VIDEOGRAPHER: The time is 10:46 a.m. This begins unit number 2. We're on the record.
BY MR. DORNBERGER:
Q. Okay, Mr. Williams, I want to go back to the list of topics which is Exhibit Number 1 in front of you. We're going to go to topic number 18. We



were already talking about this one but I just want to make sure I have everything that you can tell me about this topic on the record here. The topic is, "All systems used by plaintiff to monitor electronically the activity of its subscribers to determine if its copyrighted articles are emailed to an unauthorized user or if an unauthorized user attempted to gain access."
Other than the systems we've talked about already, are there any other systems that Capitol Forum uses to monitor electronically the activity of its subscribers.
A. Not electronically. We rely on word of mouth. Our subscribers pay a lot of money for the subscriptions so sometimes they will come to us and say, hey, we've seen an example of illicit forwarding, something along those lines.
Q. Okay. I want to go to topic number 22. This is a similar topic. It's a little bit different. The topic is, "All efforts you have taken to protect the alleged infringed material from copyright infringement."



Does Capitol Forum put a copyright notice on its articles?
A. Yes. We put it on the email as well as the article itself. So on the email at the bottom is the copyright notice. And then when you open the article itself, the PDF, it has at the bottom of the article.
Q. And when you say email, you're talking about that email that is sent out to the subscribers when the article is first published?
A. Yes, that's right.
Q. And I believe you testified earlier that usually has the headline of the article and maybe the first paragraph in the email?
A. That's exactly right.
Q. And then you said in the PDF itself of the article, there is a copyright notice?
A. Yes.
Q. Where is the notice at?
A. It's at the bottom of each page, every single page. And then we also will watermark our articles with a big watermark across the entire



article.
Q. And you mentioned a PDF so I want to go back to what happens when a subscriber clicks on the link and accesses an article. Does it open on the software platform in PDF?
A. No, not technically. It opens on like a web reader. But then if you download it, that would download as a PDF. We save them as PDFs and then upload them and they are -- when they are viewed, it's a web reader like .html or something along those lines.
MR. WILLIAMS: Keep your voice up, okay? I didn't --
THE WITNESS: Understood. That's what the mic's for.
THE VIDEOGRAPHER: Counsel?
MR. WILLIAMS: Oh, yeah. Sorry. Keep my voice up. Sorry.
THE WITNESS: I can go much louder if you guys need it. No, I'm just kidding. I'm make a note of that.
BY MR. DORNBERGER:

[redacted]

Q. That would be helpful just so we get everything on the record.
A. I understand.
Q. I'm a very loud person by myself so I have no trouble but --
A. I am too, so I'll go a little louder.
Q. Just one more little nitpick, Mr. Williams, Mary's doing her best job to get everything we say down. It's really difficult for her to do that if we talk over each other. So if you could just please -- and I know you're trying to so I'm not accusing you of anything -- wait for me to finish completely my question. Oftentimes we finish each other's sentences and just give the answer out as fast as we can. I don't want you to do that today. And I will try to do the same. I will wait for you to finish giving your answer before I ask my next question.
Okay, you mentioned a watermark. Can you tell me about that.
A. Yes. We put a watermark on the document in the platform. You will see the watermark both as



you view it and then also if you download it. The PDF itself will have the watermark. Is watermark is the email address of the user.
Q. Let's go back to the copyright notices. We've got it in the email, on the bottom of each page of the articles. Did Capitol Forum always use those same copyright notices back when it started in 2012?
A. It took us about six months to a year to receive copyright protection and so prior to that, we did not put them on the notices but as soon as we received copyright protection, yes, we put them both in the emails and on the articles.
Q. So you said you didn't originally put them on the notice. Was that the email that gets sent out to the subscribers?
A. Well, you're talking about prior to us receiving copyright --
Q. Yeah.
A. -- authorization? Yes, prior to having it, prior to receiving copyright authorization, we did not include the copyright notice.
Q. Anywhere?



A. Anywhere because it was not copyrighted.
Q. I just want to make sure I have the right --
A. Yeah.
Q. -- answer on the record --
A. Yeah.
Q. -- Mr. Williams. What about the watermark, when did Capitol Forum start watermarking the PDFs of these articles?
A. In approximately 2013. I'm almost certain of that. It's possible it's early 2014 but I'm almost certain it's late 2013. Before Nevo, we went to a service calls Watchdox which automatically watermarked our articles.
Q. Why did Capitol Forum put a watermark on the articles?
A. To protect our copyright and ensure that unauthorized distribution would be limited, we felt that having the watermark would discourage people from sending the articles around.
Q. And I skipped a topic, Mr. Williams, so we're going to go back to the topic list, number 21,



the preparation of access history records. And I understand that Exhibit 2 is an example of the access history records for these articles, so I just want to ask more of a technical question. How was that Exhibit 2, for example, generated? Was it an automatic system as in the software is built to generate that report or is somebody manually copying and pasting data from a database into the document?
A. No, it was -- I apologize for talking over you. The system generates that.
Q. So for topic number 23, the identity of all other individuals and/or entities who accessed, received or otherwise viewed each alleged infringed material from plaintiff. And there is a very big access record that we have as part of the litigation. I'm not going to put it into evidence. It's really, really long. But if I wanted to know who else was looking at those articles, I would just go look at these access records, is that right?
A. That's correct.
(Exhibit No. 3 was marked for identification.)

[redacted]

Churchill Capital copyright notice got on the bottom of a Capitol Forum article and specifically the article shown in Exhibit 3?
MR. WILLIAMS: Hold on. I'm going to object to the form.
THE WITNESS: Could you repeat the question?
MR. WILLIAMS: You started one question, then you did another, and I don't think it made sense but if you want to -- well, he's asked to have it back.
BY MR. DORNBERGER:
Q. My question, Mr. Williams, is does Capitol Forum have any idea how a Churchill Capital copyright notice ended up on the bottom of Exhibit Number 3?
A. Could you show me what you're referring to? Because I don't see it here.
Q. It isn't here.
A. Yeah.
Q. It's in BTG's records.
A. Not off the top of my head.
MR. WILLIAMS: Well, he's asked to see it.



THE WITNESS: What I would say is that pre-2019, we would put the full text of articles occasionally in emails, and it's possible that somebody could have copied that text from the email, put it into their own email, and then that would be generated. But without seeing it, I'm speculating on something that I don't really know about.
BY MR. DORNBERGER:
Q. Okay. Well, that's a really important fact, Mr. Williams, and I want to learn more about that. We've been talking today about publishing articles via email, when they get published, the headline of the article and the first paragraph gets stuck in an email. But that wasn't always the case?
A. No, that was not always the case. Starting in 2019, we completely went away from that, but there was a period of time before 2019 where we would occasionally put the full text in an email.
Q. Who made the decision whether to put the full text or not?
A. It was generally an editorial decision, publishing decision.



Q. Let's say in 2017 when this article was published, who was in charge of the editorial decisions?
A. Teddy and I would be.
Q. So if I understand it correctly, pre-2019, there were Capitol Forum articles where the full text of the article got emailed out to subscribers, right?
A. That's correct.
Q. And if your subscriber just forwarded that email on to a non-subscriber, Capitol Forum would have no idea that happened, right?
A. Well, we would be able to look at the forwarding data because it would be in the email.
Q. That's only if the person who received the forward clicks on a click, right?
A. Yeah. Well, I said that and now that you're asking me, I would have to check with our IT team. But I'm actually fairly certain that the forwarding itself, if opened, if the article is opened as opposed to clicked on the link, that the IP address would appear.
Q. I'm asking about a very specific email so



I want to go back and --
A. Sure.
Q. -- give you the preface for my question. Pre-2019, if the full text of a Capitol Forum article was put into an email that was sent to subscribers --
A. Yep.
Q. -- and that article was -- or I'm sorry, that email with the article text was forwarded, how would Capitol Forum know it was forwarded to a nonsubscriber?
A. If enough IPs associated were generated, we would have some sense. I realize now that you asked me and I said it was a clicked link but if it is actually forwarded and opened, we are able to see IP patterns.
Q. Right. So that's only when somebody clicks on the link in that email, right?
A. Well, no, opens the email itself.
Q. Okay. Now I'm even more confused. If I'm a subscriber and I get an email from Capitol Forum with a full text of the article pre-2019, you're saying that Capitol Forum knows when I open that

[redacted]

This ends unit 2. Off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 11:37 a.m. This begins unit 3. On the record.

BY MR. DORNBERGER:

Q. Okay, Mr. Williams, we can put away Exhibits 5 and 6. I'm going to hand you three exhibits this time.

(Exhibit No. 7, 8 and 9 were marked for identification.)

MR. DORNBERGER: That's 7, that's 8 and that's 9.

MR. WILLIAMS: 7 is number 15 there?

MR. DORNBERGER: 7 is numbered 15, correct.

MR. WILLIAMS: 8 is 118, right?

MR. DORNBERGER: Correct.

MR. WILLIAMS: Okay.

BY MR. DORNBERGER:

Q. Okay, Mr. Williams, we've marked three different exhibits, 7, 8 and 9. Let's just identify them for the record. 7 has a Bates Number at the



bottom TCF000015, correct?

A. Correct.

Q. Number 8 has a Bates Number TCF009118, correct?

A. Correct.

Q. And number 9 has a Bates Number TCF009123, correct?

A. That's correct.

Q. Do you recognize these three exhibits?

A. I do.

Q. Can you tell me generally what's shown in these exhibits?

A. It's an income statement for all three, as I understand them, except actually Exhibit 9 is just revenue by month, I believe.

Q. Let's go to 9 because I just -- I'm not sure I really understand what's being shown here.

THE VIDEOGRAPHER: Counsel, your hands are showing.

MR. DORNBERGER: Sorry about that.

BY MR. DORNBERGER:

Q. Let's go to Exhibit Number 9,



Mr. Williams. Can you tell me what's being shown here in Exhibit 9?

A. This is revenue focused on investor subscribers.

Q. What is an investor subscriber?

A. Well, we have several types of subscribers. Financial firms, which is what this captures. Financial firms would probably be a better term than investor here. And then we have law firms, which is not included here. And then government regulators is the third biggest bucket, which is also not included here.

Q. And what is the first column, annualized revenue from investor subscribers? What is that meant to show?

A. The annual revenue from investor subscribers, the -- I'm trying to think of a different way to say it. Is that --

Q. Well, the data on the left is by month, right?

A. Yeah, it's -- yeah.

Q. So the first month is -- it looks like



it's the last day of the month. It's January 31st, 2018.

A. Yeah, yeah, yeah.

Q. The second data entry is February 28th, 2018.

A. Yeah.

Q. And then there is some data in that annualized revenue from investor subscribers, and I'm just trying to understand what's meant to be shown in the annualized revenue column?

A. So it's meant -- probably, if we were to do it again, we would do monthly revenue from investor subscribers to make it easier to read, and it's an annualized version. So if you divide that by 12, that would be the monthly subscribers, monthly revenue rather, from investors per month.

Q. Okay. And then there is a number of investors in the column on the -- to the right of annualized revenue, and that's just a count of how many financial firms are in this bucket, right?

A. That's correct.

Q. And annualized revenue per investor

[redacted]

paper and things like that. Really it's rent.
Q. Does Capitol Forum have a physical office here in D.C.?
A. We do.
Q. Do journalists typically work out of the office?
A. Yes, though we are a hybrid work environment. It's not like we say you have to be in the office 10 years a day. We want people on the Hill interviewing sources, those type of things.
Q. Taxes and licenses, generally can you tell me what's included in that?
A. That's any tax we owe. Obviously there's, you know, D.C. taxes unrelated to income at times or profit at times. Licenses might be tools to help the journalists do their jobs.
Q. And then there's two other line items, travel, meals?
A. Yeah.
Q. Is that for journalists traveling? Is it for these conferences? Can you tell me what's in there?



A. I don't think it would be associated with the conferences because that would probably be hosted events, but we have a team throughout the U.S. now. We offer -- you know, we want people to come to the office occasionally. If we do a holiday party, they'll travel and we'll pay for it. And meals, we try to do a weekly lunch to encourage people to come into the office. You can see obviously a decrease when COVID happened for both rent and office and travel and meals accordingly.
[redacted]



[redacted]
Q. We can put away Exhibit Number 8.
(Exhibit No. 10 was marked for identification.)
BY MR. DORNBERGER:
Q. Okay, Mr. Williams, you've been handed what's been marked by the court reporter as Exhibit Number 10. This appears to be a string of emails with a Bates Number here at the bottom TCF000934, correct?
A. That's correct.



Q. Okay. And I understand that this relates to allegations of copyright infringement against Bloomberg. Can you generally tell me what the allegations of copyright infringement against Bloomberg were?
A. The allegations are that they were republishing portions of our content on something called Bloomberg First Word which was an email blast, like daily email type thing that went to their subscriber base.
Q. How many articles do you think were infringed by Bloomberg on First Word?
A. 150 approximately.
Q. Where did Bloomberg get these approximately 150 articles from?
A. They were getting them from David Witkin.
Q. Okay. So David Witkin is a subscriber of Capitol Forum, right?
A. That's correct.
Q. And there's an email here shown from him with Teddy Downey on Exhibit 10, right?
A. That's correct.

[redacted]

Q. And Capitol Forum believes all 150 of these articles that Bloomberg republished came from Mr. Witkin?
A. I think that's accurate, yes.
Q. How did Capitol Forum first find out that Mr. Witkin was the source of these articles?
A. We were able to use the email forwarding technology that I mentioned earlier to identify him as the likely culprit.
Q. So there were hits on articles sent to Mr. Witkin over that threshold?
A. Yes.
Q. On those daily reports that we talked about?
A. Yes.
Q. Do you know approximately how many of those reports that you used to determine it came from Mr. Witkin?
A. Well, clarifying point is that the report is only generated post-2019 so we would have been looking at Campaign Monitor data to identify it.
Q. Okay. And I apologize. This email is



from 2017, right?
A. Yes.
Q. When generally does Capitol Forum believe the infringement with Bloomberg occurred?
A. I believe it was late 2016 to 2017.
Q. Who at Bloomberg got access to the articles, do you know?
A. Josh Fineman.
Q. Do you know what mechanism Mr. Witkin used to send articles to Mr. Fineman?
A. I believe he forwarded on the emails.
Q. So you believe -- and you being Capitol Forum -- believe Mr. Witkin forwarded the emails notifying Mr. Witkin of a Capitol Forum publication, right?
A. Notifying Mr. Fineman of the -- Witkin sent them to Fineman.
Q. Right, so let me ask that question again. Mr. Witkin would get an email as a subscriber when a Capitol Forum article was published, right?
A. That's correct.
Q. That would include at least some portion



of the article, right?
A. Yes, with the headline, at least the headline and the first paragraph.
Q. And Capitol Forum believes Mr. Witkin forwarded those emails on to Mr. Fineman, correct?
A. Correct.
Q. Did any of those emails have the full text of the Capitol Forum article?
A. Yes, almost certainly.
Q. Do you know generally how many of those approximately 150 had the full text?
A. I don't.
Q. Was it more than half?
A. I think half is possible.
Q. Okay. And then Capitol Forum contacted Mr. Witkin regarding the alleged infringement, right?
A. We did.
Q. And that's shown here in Exhibit 10?
A. That's correct.
Q. What did Capitol Forum say to Mr. Witkin?
A. Well, as you see in the email, we ask him if he shared the articles and then we asked him to



please stop doing that.
Q. And if you go down to an email, third down from Mr. Witkin dated December 19, 2017 at 4:59 p.m., do you see that?
A. Yes.
Q. In his first line he says, "I'm sorry, yes, I have shared some articles with him," right?
A. Yes.
Q. Do you think 150 articles is "some"?
A. You're asking me what -- how David writes an email so I'm not really able to speculate on that. If I had to guess, I think he was trying to downplay his involvement but you'd have to ask somebody else that question.
Q. His second sentence says, "He had done me favors by getting me access to stuff I didn't have," right?
A. Correct.
Q. And that's commonplace in the financial industry, isn't it?
A. Again, you're asking me to speculate about an industry that I haven't actually worked in.

Q. But those are your customers, aren't they?
A. David Witkin is a customer, yeah.
Q. And generally, financial industry, those are your customers. I mean, we just looked at that spreadsheet. They're the highest revenue generating segment of Capitol Forum, right?
A. Yes.
Q. You know that the financial industry is trading these articles and publications around with each other all the time, right?
MR. WILLIAMS: Object, form.
THE WITNESS: Generally, as I understand it, Wall Street is very good at not forwarding around copyright -- copy written material because they understand that there are penalties for it. And so David is a single operator and my take, again, not having worked in the industry, is that of course information flies around but that generally financial firms train on copyright law to prevent unauthorized copyright violations.
BY MR. DORNBERGER:
Q. How would you know that, Mr. Williams?



You just said you never worked in the financial industry.
A. And then you asked me to speculate based on my knowledge of the field I am in. I don't know that for a fact.
Q. Well, you just testified you think financial firms train on copyright, and I'm asking you how do you know that?
A. Sure. You asked me to answer that after I said I can't speculate but having worked in the industry long enough, in the media industry working with these firms, subscribers will sometimes come to us if they receive an unauthorized copy and say, hey, this is a problem. And my understanding is generally these firms train on things like compliance, like copyright, et cetera.
Q. And Capitol Forum didn't go after Mr. Witkin as a subscriber for sending 150 articles to Bloomberg, did they?
MR. WILLIAMS: Whoa, object. Instruct not to answer. Attorney-client.
BY MR. DORNBERGER:



Q. Other than sending this email, Mr. Williams, what else did Capitol Forum do against this subscriber, Mr. Witkin, for forwarding 150 emails?
MR. WILLIAMS: Object and instruct not to answer, attorney-client.
MR. DORNBERGER: On what basis?
MR. WILLIAMS: Because I was involved at that time and any action Capitol Forum took was under my direction and guidance -- excuse me, not -- that I took that action, okay? He's aware of it but I dealt with Witkin and that's attorney-client.
MR. DORNBERGER: Okay. I'm not asking for the communication between you and Capitol Forum. I'm asking what Capitol Forum did. If you were acting as Capitol Forum's agent, I'm entitled to know what you did with this third party. Unless you're intending that your communication with Mr. Witkin is somehow privileged, the witness needs to answer.
MR. WILLIAMS: Okay. Go ahead. What do you know?
THE WITNESS: Sorry. Could you repeat the



question?
BY MR. DORNBERGER:
Q. Sure. Other than sending Mr. Witkin this email, did Capitol Forum take any other action against him for forwarding 150 articles to Bloomberg?
A. We contacted him and he agreed to walk us through his behavior, but we did not file a lawsuit against Mr. Witkin, if that's what you're asking.
Q. Did he pay you any money?
MR. WILLIAMS: Object. Actually, no, you can answer that question.
THE WITNESS: No.
BY MR. DORNBERGER:
Q. When you say "walk Capitol Forum through," what do you mean?
A. I didn't have the conversation so we talked to him to ensure that he would not continue to send on the articles after this.
Q. And he's working at Beryl Capital, do I have that right?
A. That's correct.
Q. Do you know how much money Beryl Capital

pays Capitol Forum for its subscription?

[redacted]

THE WITNESS: Yes, that's -- some of our subscribers are big financial agent -- entities, excuse me, who might have that much assets under management. But he is a one-man shop.

BY MR. DORNBERGER:

Q. That was my next question, Mr. Williams. You used an acronym, AUM, and I believe you just defined that as assets under management, right?

A. Correct.

(Exhibit No. 11 was marked for identification.)

THE WITNESS: Thank you.

BY MR. DORNBERGER:

Q. Okay, Mr. Williams, you've just been

Page 98

handed what has been marked as Exhibit Number 11 by the court reporter.

A. Yep.

Q. This is an email from Teddy Downey to you and Mr. Baine dated July 6 of 2017, right?

A. Yes.

Q. I believe this relates to allegations of copyright infringement against Blue Ridge. Can you tell me generally what the allegations of copyright infringement were from Capitol Forum against Blue Ridge?

A. Yes. An analyst at Blue Ridge was sending on our articles to several other financial firms in violation of our copyright.

Q. And how was Blue Ridge doing that?

A. They were, again, forwarding the emails.

Q. So that was forwarding the emails they got -- and I'm sorry, they, Blue Ridge, got as part of their subscription when a Capitol Forum article was published, right?

A. That's correct.

Q. Approximately how many articles were

Page 99

forwarded by Blue Ridge?

A. I believe it was 30 or 40.

Q. And this was in 2017 so that likely also included full text articles in the email, correct?

A. Correct.

Q. How did Capitol Forum find out about the alleged infringement from Blue Ridge?

A. I believe we were alerted to it by a subscriber who said, hey, these guys are forwarding your articles, sending your articles to other people and talking poorly about them.

Q. The people were talking poorly about The Capitol Forum article?

A. Blue Ridge, the analyst there, did not like the coverage and was talking poorly about the coverage, not necessarily about the firm but about the topic.

Q. Okay. And in Mr. Downey's email, he's talking about, in that first sentence, "Got more feedback that hedge funds are stealing our stuff and it is a major reason they don't reach out to subscribe."

Page 100

Did I read that right?

A. You did.

Q. Does Capitol Forum sell subscriptions to hedge funds?

A. Yes.

Q. Are they part of the financial firm count that we looked at previously?

A. Yes.

Q. I want to go down to Mr. Downey's fourth line, "There is some urgency." Do you see that?

A. Yes.

Q. And at the end of that sentence, it says, "I'm hearing pretty regularly (latest was from a friend who talked to his buddy who is now at Citadel)," right? Did I read that right?

A. You did, yes.

Q. So this is Mr. Downey receiving information from others that these financial firms are sharing Capitol Forum publications, do I have that right?

A. That's correct.

Q. And according to Mr. Downey, that happens

Page 101

[redacted]

pretty regularly, right?
A. Yes, that's what he wrote there.
Q. I mean, at the bottom of this email, he says, "Anyway, I'm getting pretty annoyed at how easy it is for Wall Street to steal our stuff at this point," right?
A. Yes.
Q. So Capitol Forum knew in 2017 that these financial firms were sharing copyrighted Capitol Forum articles, didn't it?
A. Yes.
Q. Now, Mr. Downey suggests in this email, instead of going after Wall Street for stealing articles, instead to go after them to make more subscriptions, right?
A. Would you point me to what you're referring to? He writes a lot of emails so I just want to make sure we're talking about the same thing.
Q. Yeah, if you go to a line about in the middle of the page starting with, "A buddy of mine"?
A. Yeah.
Q. He says, "A buddy of mine has a lot of



success selling subscriptions to stolen fonts this way."
A. I don't consider it mutually exclusive considering he asks that we draft up or our lawyers draft up a letter to Blue Ridge or give him a deadline to get the letter, but he is I think suggesting that unauthorized distribution is hurting our business and that so we should both enforce our copyrights and also try to get people to understand they need to subscribe if they're receiving our content.
(Exhibit No. 12 was marked for identification.)
THE WITNESS: Thank you.
BY MR. DORNBERGER:
Q. Okay, Mr. Williams, you've just been handed what's been marked Exhibit Number 12 by the court reporter. This is an email from Trevor Baine to you and Mr. Downey dated August 24, 2016, right?
A. Correct.
Q. And I believe this relates to the infringement of or the allegations of copyright



infringement against Rangeley. Can you tell me generally about the copyright infringement allegations Capitol Forum had against Rangeley?
A. Sure. Chris DeMuth, who was at Rangeley -- in fact just as with Witkin, it was a one-person shop -- he was a subscriber. He received our content and then was uploading portions of it or, in some cases, maybe even a full article into a chat room he hosted I believe on Seeking Alpha, but I'm not certain of that.
Q. At the bottom of Mr. Baine's email, that last paragraph, the first sentence says, "I'm generally opposed to going after people for forwarding around," right?
A. Yes, I see that.
Q. And Capitol Forum knew in 2016 articles were being forwarded by its subscribers, right?
MR. WILLIAMS: By a subscriber here.
THE WITNESS: Yes. I think what he is getting at is that it is detrimental to our business to make accusations of people, and so you want to be very careful in doing so but that this particular



instance, hosting -- taking the article or sections of the article and putting it in a paid chat room is actually more egregious.
We were fairly new at this point and over time we realized that you have to enforce your copyrights in order to be successful. And so this was the actually first time we ever made a determination to enforce our copyright.
(Exhibit No. 13 was marked for identification.)
BY MR. DORNBERGER:
Q. Before we get to Exhibit 13, Mr. Williams, I just want to go back to you said you thought Mr. DeMuth was hosting a chat room that was a paid service. Can you explain that?
A. I believe, on Seeking Alpha, you have these communities where you might pay $10 a month or something to access the thoughts of the person and that he was taking portions of our articles and putting them in that chat room.
Q. And I forgot to ask you this. How many articles do you think or does Capitol Forum believe

[redacted]

Q. Okay, Mr. Williams, you've just been handed what has been marked Exhibit Number 14 by the court reporter. This is a settlement agreement. It's got a Bates Number here at the bottom TCF009068, and this is for Blue Ridge, right?
A. That's correct.
Q. Is this settlement in regards to the infringement we talked about from Blue Ridge, the approximately 30 to 40 articles forwarded by the analyst?
A. Yes.
Q. And this is a true and accurate copy of the settlement between Capitol Forum and Blue Ridge for that alleged infringement, right?
A. Yes.
(Exhibit No. 15 was marked for identification.)
THE WITNESS: Thank you.
BY MR. DORNBERGER:
Q. Okay, Mr. Williams, you've been handed what's been marked by the court reporter Exhibit Number 15. This is another settlement agreement.



This has a Bates Number at the bottom of TCF009063. This is the settlement agreement for Rangeley Capital, right?
A. That's correct.
Q. And this relates to the infringement we just talked about for Rangeley, which was Mr. DeMuth posting approximately three or four articles in a chat room, right?
A. That's correct.
Q. And does Exhibit 15 show an accurate and correct copy of the settlement agreement between Capitol Forum and Rangeley Capital for that alleged infringement?
A. It does.
(Exhibit No. 16 was marked for identification.)
THE WITNESS: Thank you.
BY MR. DORNBERGER:
Q. Mr. Williams, you've been handed what's been marked by the court reporter as Exhibit Number 16. This is another settlement agreement with a Bates Number at the bottom TCF009073. This is for



Bloomberg, correct?
A. Correct.
Q. And this is a settlement agreement for the copyright infringement allegations against Bloomberg for republishing approximately the 150 Capitol Forum articles, right?
A. That's correct.
Q. And this is also a true and correct version of the settlement between Capitol Forum and Bloomberg for that infringement with the only exception on page 2, the amount is redacted?
A. That's correct.
Q. Okay.
(Exhibit No. 17 was marked for identification.)
BY MR. DORNBERGER:
Q. Mr. Williams, you've been handed what's been marked by the court reporter as Exhibit Number 17. This has a Bates number at the bottom TCF009112. Do you recognize this document?
A. I do.
Q. Can you tell me what it is?



A. It's a subscriber list as of 9/20/2024.
Q. So this is a Capitol Forum subscriber list dated September 20, 2024, right?
A. That's correct.
Q. How many different companies are on this list?
A. 249.
Q. And when we were talking about the financial companies, you said there could be between three subscribers and 20 subscribers, maybe sometimes one. Is the same generally true for the non-financial subscribers?
A. I would say generally. Our distribution list is currently just under 3,000 people and we have probably more subscribers now than we did then but that probably works out to about 10 users.
Now, generally speaking, law firms have more subscribers than financial firms. The FTC I believe has 50 people on it, for instance. So there's a good deal of discrepancy between each subscribed organization but as a proxy, I think 8 to 10 people per subscribed organizations would not be a

[redacted]

part of -- or that would be a decent estimate.

MR. DORNBERGER: Why don't we take a quick break.

THE VIDEOGRAPHER: The time is 12:26 p.m. This ends unit 3. We're off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 12:33 p.m. This begins unit number 4. On the record.

BY MR. DORNBERGER:

Q. Okay, Mr. Williams, if you have Exhibit Number 1 in front of you, the topics that we're talking about today.

A. Oh, yes. Sorry. Yes, I do.

Q. I want to go to topic number 13.

A. Got it.

Q. This one asks about the copyright infringement allegations against Market Securities. So in general, can you tell me how did Capitol Forum learn of the alleged infringement from Market Securities?

A. One of our subscribers reached out and said this group, Market Securities, is sending out



blasts of your work following the publication of your articles.

Q. And what did Capitol Forum do next?

MR. WILLIAMS: Well, we're getting into attorney-client here. You can say what you did next, which was contact.

THE WITNESS: Well, that's exactly what we did. We contacted counsel and asked them to reach out to Market Securities regarding the alleged infringement.

BY MR. DORNBERGER:

Q. I mean, you eventually sued Market Securities for copyright infringement, right?

A. We did.

Q. How did Capitol Forum find out about BTG as the alleged source of articles to Market Securities?

A. As a part of the discovery process, they produced documents to us, some of which seemed to indicate Christina Suarez's forwarding of our articles.

Q. Did you go back and look for these daily



reports to see if there were any IP hits on Ms. Suarez's emails?

A. We did do some analysis to try to determine who it was, yes.

Q. And what did you do generally?

A. Well, we went -- once we found out that -- once we received discovery from Market Securities, we went and looked at Ms. Suarez's download history.

Q. Did you do anything else?

MR. WILLIAMS: Other than talk to counsel? Yeah.

THE WITNESS: No, we took it to -- well, I shouldn't say no, but we went to counsel once we received those discovery documents which came through him.

BY MR. DORNBERGER:

Q. Did you look to see if Ms. Suarez showed up on any of these daily reports for the IP hits?

MR. WILLIAMS: I'm sorry, what period of time?

MR. DORNBERGER: In any period of time.

MR. WILLIAMS: Well, they didn't know



about Suarez until --

MR. DORNBERGER: Well, that's what I'm asking.

BY MR. DORNBERGER:

Q. After you found out about BTG's alleged involvement --

MR. WILLIAMS: Okay.

BY MR. DORNBERGER:

Q. -- did you go back and look at any of these IP hit reports to see if she had shown up?

A. I am actually not certain we did because we looked at her download history and saw a great deal number of downloads that coincided with the Market Securities blast. When you download an article, we are unable to track it after downloading. So we didn't believe that it was email forwarding in this case as opposed to downloading to her desktop and then sending through some other service like email or Evernote or something along those lines.

Q. Let's go on to topic number 15, Mr. Williams. This is Capitol Forum's efforts and procedures to preserve information, including but not