[redacted]

# EXHIBIT 3

[redacted]

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
DBW PARTNERS, LCC d/b/a/ THE :
CAPITOL FORUM, :
Plaintiff, : Civil Action No.
v. : 1:24-cv-09836-LGS
BTG PACTUAL ASSET MANAGEMENT :
US, LCC, :
Defendant. :
- - - - - - - - - - - - - - - X

Washington, D.C.
Tuesday, July 1, 2025

Videotaped deposition of THEODORE "TEDDY" DOWNEY, an individual and Rule 30(b)(6) witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of Troutman Pepper Locke, 401 9th Street, N.W., Washington, D.C., at 10:02 a.m., Tuesday, July 1, 2025, and the

[redacted]

proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiff DBW Partners d/b/a The Capitol Forum:

JOHN B. WILLIAMS, ESQ.
jbwilliams@hartylawgroup.com
Harty Williams
1629 K Street, N.W.
Washington, D.C. 20006
(202) 277-8435

On behalf of Defendant BTG Pactual Asset Management US, LLC:

RYAN E. DORNBERGER, ESQ.
ryan.dornberger@troutman.com
Troutman Pepper Locke LLP
600 Travis Street, Suite 2800
Houston, Texas 77002
(713) 226-1200

ALSO PRESENT:

ORSON BRAITHWAITE, Videographer



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR |
| --- | --- |
| THEODORE "TEDDY" DOWNEY | DEFENDANT |
| BY MR. DORNBERGER | 7 |
| BY MR. DORNBERGER - Rule 30(b)(6) | 101 |


E X H I B I T S


| EXHIBIT | | PAGE |
| --- | --- | --- |
| NO. 1 | July 6, 2017 email from Teddy Downey to Trevor Baine, TCF000931 | 41 |
| NO. 2 | December 21, 2017 email from David Witkin to Teddy Downey, TCF000934 | 49 |
| NO. 3 | April 25, 2023 email from Teddy Downey to Jake Williams, TCF000016 | 59 |
| NO. 4 | April 25, 2023 email from Teddy Downey to Jake Williams, TCF000018 | 66 |
| NO. 5 | April 25, 2023 email from Teddy Downey to Jake Williams, TCF000021 | 71 |
| NO. 6 | April 19, 2023 email from Joseph Alba to Jake Williams, TCF000028 | 82 |




E X H I B I T S (Continued)


| EXHIBIT | | PAGE |
| --- | --- | --- |
| NO. 7 | April 19, 2023 email from Joseph Alba to Jake Williams, TCF000033 | 86 |
| NO. 8 | Capitol Forum's Response to BTG Pactual's First Set of Interrogatories (Nos. 1-14) | 102 |
| NO. 9 | Capitol Forum's Supplemental Response to BTG Pactual's Interrogatories 1 and 13 | 102 |
| NO. 10 | Defendant BTG Pactual Asset Management US, LLC's Second Set of Interrogatories to Plaintiff (Nos. 15-20) | 102 |
| NO. 11 | Capitol Forum article dated January 17, 2017, TFC000913 | 114 |

P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning. We are going on the record at 10:02 a.m. on July 1st, 2025. Please note that the microphones are sensitive and may pick up whispering and private conversations. Please mute your phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit 1 of the video recorded deposition of Mr. Teddy Downey in the matter of DBW Partners, LLC, et al. versus BTG Pactual Asset Management filed in the United States District Court for the Southern District of New York, Civil Action Number 1:24-cv-09836-LGS.

My name is Orson Breathwaite representing Veritext Legal Solutions and I'm the videographer. The court reporter is Mary Grace Castleberry from the firm Veritext Legal Solutions.

Will counsel now state their appearances and affiliations for the record beginning with the noticing attorney.

MR. DORNBERGER: Good morning. This is



Ryan Dornberger from Troutman Pepper Locke on behalf of the defendant, BTG.

MR. WILLIAMS: John Williams for plaintiff.

THE VIDEOGRAPHER: Thank you. Will the court reporter please swear in the witness.

Whereupon,

THEODORE "TEDDY" DOWNEY,

was called as a witness by counsel for Defendant, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. DORNBERGER:

Q. Good morning, Mr. Downey.

A. Good morning.

Q. Can you please state your full name for the record?

A. Theodore Downey.

Q. Have you ever been deposed before?

A. No.

Q. There's a couple of ground rules I'll give you here at the start. The most important one is the



court reporter here can only take down things when we're speaking one at a time. And oftentimes in normal conversation, we try to finish each other's sentences in our heads and speed the conversation along. I want you to try not to do that today. I will do the same. I will wait until you've completely finished answering your question -- my question before asking the next question. We may trip up but we'll try to not speak over each other today, okay?

A. Yeah.

Q. Next, the videographer obviously is taking video. If at any time you want to take a break, this isn't a sprint, more like a marathon, happy to take a break. Just let me know. I would only ask that you finish answering whatever question I've asked before we take that break.

Is there any reason you can't tell the truth today?

A. No.

Q. What is your background? Did you go to college?



A. I went to college.

Q. Where did you go?

A. I went to Columbia University.

Q. And what did you study?

A. English.

Q. When did you graduate from Columbia?

A. 2004.

Q. What was your first job out of undergrad?

A. I, you know, had a couple of odd jobs but I worked on the Kerry/Edwards campaign in advance, setting up events.

Q. How long did you do that?

A. Until the election, so from graduation until election.

Q. What did you do next?

A. I tried to get a series of internships. You know, one was at an advertising firm and one was at a polling firm.

Q. Did you actually get any of those internships?

A. Yeah, no, I got -- yeah, I tried and got two internships.

[redacted]

Q. So you were the one that first came up with the idea of founding Capitol Forum?
A. Yes.
Q. And how did Jake and Trevor respond to that?
A. They said okay.
Q. What year approximately did you found Capitol Forum?
A. I got a notification in my LinkedIn that it's been 13 years.
Q. So that was approximately 2012?
A. Yes.
Q. Do you recall about how many employees you started with?
A. Employees, uh, two maybe. I mean, one at a time I think.
Q. What were you doing when you first started Capitol Forum? What was your job?
A. I would write with the team.
Q. And what topics were you generally writing about?
A. When we started Capitol Forum, one of the



things we really wanted to focus on was monopoly and antitrust so primarily we would write about mergers.
Q. How did you come up with the topics that you would write about when you first started Capitol Forum in 2012?
A. Well, mergers are really easy to figure out which ones are going on because they're public, publicly announced.
Q. Is that it? You would just look at the public mergers?
A. Yeah, for the most part.
Q. Who were the clients of Capitol Forum in 2012?
A. We didn't have that -- well, we were targeting merger arb investors.
Q. Is there a reason you were specifically targeting merger arb investors?
A. Well, part of the business plan was to focus on monopoly and it is, you know, I would say when you're writing about monopoly and mergers, some of -- the customers that really want to pay for that are merger arb investors. So it made sense to, you



know, target that audience to, you know, try to sell subscriptions.
Q. Do you know what these merger arb investors would do with Capitol Forum's research?
A. They would bet on mergers or they would use it to inform their bets on mergers.
Q. Do you recall approximately how many subscribers Capitol Forum had in 2012?
A. You mean after a year of operation?
Q. Sure.
A. I have no idea. I do not remember.
Q. How many subscribers does Capitol Forum have today?
A. I should know that. Several hundred.
Q. There weren't nearly that many subscribers back in 2012, were there?
A. No.
Q. How many employees does Capitol Forum have today?
A. About 50.
Q. And what is your current job responsibilities?



A. I am the CEO and the executive editor.
Q. How do you spend most of your time?
A. Managing people, managing reporters.
Q. Okay. Walk me through that. If you're managing a reporter, are you suggesting topics? Are you reviewing drafts? What are you doing?
A. I have a weekly conference call with the people that are on my team. I have regular conference calls with other heads of other parts of the business, the cofounders, the head of the European team. I'm in email dialogue with the head of my corporate investigations team and I regularly review drafts and make strategic suggestions for the people on my -- that directly report to me on my antitrust conduct team.
Q. How many reporters does Capitol Forum have today?
A. 35-ish.
Q. Are you managing all 35 of those?
A. No.
Q. How many are you specifically supervising?
A. Well, there's some shared responsibility

[redacted]

on Exhibit 1, right?
A. It's there, sure. I just don't remember it. It's eight years ago.
Q. Sure. And today, do you know anybody personally over at Citadel?
A. We have subscribers there.
Q. Do you know anybody personally?
A. I'm sure I do but I can't give you their name off the top of my head. There are different pods at Citadel with different names. I'm sure I know a handful of people there.
Q. What kind of company is Citadel?
A. It's a hedge fund but they do other stuff too, but my experience with them is as a hedge fund.
Q. Okay. Here at the very bottom of your email on Exhibit 1, you say, "I'm getting pretty annoyed at how easy it is for Wall Street to steal our stuff at this point," right?
A. Yes.
Q. Do you remember writing that?
A. No, but it's here.
Q. Do you agree with the sentiment here in



your email?
A. I agreed eight years ago before we sued -- threatened to sue Blue Ridge, sued Bloomberg, and then sued your client and Market Securities. I don't worry about this anymore as much because people know that if they violate our copyright, we will sue them. So I don't feel this way anymore.
Now, I certainly would if it were true. You know, our growth has been consistent. I would certainly -- if this was presented to me now like it was eight years ago, I would be very upset, I'm sure, but I don't -- this is not my experience with how the business operates now.
Q. You said if growth was consistent, and I'm just not sure what you meant by that. Are you saying now growth is consistent?
A. When we experience periods of time when there was a subscriber or third party that is persistently violating our copyright, we notice retrospectively that, oh, that can explain periods of slower growth. I would say typical for us is 15 to 20 percent growth. When someone is systematically



violating our copyright, that can be lower, flat, 5 percent, 10 percent.
So they're historically connected. And so, like I said, I don't feel that it's easy for Wall Street to steal our stuff anymore. We put in place a very good system to, you know, try to prevent this. You can't completely prevent it, obviously. There -- if someone really wants to violate copyright, they can do it. But, you know, this email says, you know, we wanted to make it hard, which we did, or painful if you get caught.
Q. Okay. You said you put in place a very good system to try and prevent this sharing and I just want to make sure we're talking about the same thing. What system is that?
A. We have our distribution system which, like I said, entails a watermark, entails a secure platform, you know, the tech team, Jake in particular has implemented measures to make it, you know, harder to print the screen, harder to do little things.
Now, there is always a trade-off in terms of being able to access the article or make it more



secure. You can't make it so unwieldy to access. There is a tension there sometimes. But we've done a number of things, we -- on the technology side to make it harder -- there's different ways to track as well. That is in the software. We have retained John Williams subsequently to vigorously pursue copyright infringement and to consult with us about how to make sure that we are getting to the bottom of it.
And it's a system that works, as I said. Prior to bringing on John Williams, you know, we had a lawyer that did the Blue Ridge stuff and the stuff prior to Bloomberg, but having someone who will do a thorough investigation and, you know, help us with our litigation strategy has -- and has been very successful for us in deterring stealing.
I believe that there are emails to that effect about -- of your client or Market Securities or other subscribers noting our litigiousness and our vigorous defense of our copyright and their lack of willingness to forward things.
(Exhibit No. 2 was marked for

[redacted]

forwards it on to Nate and then you get it from Nate, right?
A. Correct.
Q. Is there anything particularly interesting about this email from Market Securities that caught your attention?
A. Well, I'm just going to go on this email and the past one, how little I care about this because, you know, not in little I care about it. It's just not relevant to my work personally.
This is just not relevant to me so that's -- I'm like what is Market Securities? You know, and the last one, I didn't even respond. So I don't -- I just don't know. My interaction with this is who is this, who are these people. It's a normal reaction from the executive editor.
Q. And at this point in 2020, were you focused on mergers as an editor?
A. I -- you know, I'm always a little bit interested. I don't remember this at all so, you know, maybe -- you know, under normal circumstance, if I were caring about this, I could say, well, it's



interesting that Market Securities is in the same competitive space. But obviously I was not aware of that until this email.
MR. DORNBERGER: Okay, Mr. Downey, we've been going for about -- almost an hour. So why don't we take another 10-minute break and we can continue.
MR. WILLIAMS: Okay.
THE VIDEOGRAPHER: The time is 11:41 a.m. This ends unit 2. We're off the record.
(Recess.)
THE VIDEOGRAPHER: The time is 11:55 a.m. This begins unit number 3. On the record.
(Exhibit No. 5 was marked for identification.)
BY MR. DORNBERGER:
Q. Okay, Mr. Downey, you've been handed what's been marked by the court reporter as Exhibit Number 5. This is a string of emails with the Bates Number of the first page TCF000021, right?
A. Yes.
Q. Okay. Let's just jump all the way to the first email in the string on pages 4 and 5. Are you



there?
A. I think that's a different number, 000024 and 25?
Q. Right. So the first page is 21.
A. Got it.
Q. And pages 4 and 5 are 24 and 25?
A. I got it. Yeah, I'm there.
Q. So you see there is an email that starts this thread from Mr. John Frank on Monday, October 25th, 2021, right?
A. Yeah.
Q. And that's to you and Mr. Treacy, right?
A. Yes.
Q. And what did Mr. Frank email you?
A. He said, "You did not get this from me but wanted to make you aware Market Securities, a broker focused on merger arb, posts summaries of CapForum reports. Their summary of AJRD today is really specific and detailed. I know CapForum has put in real effort to dissuade" privacy -- piracy -- "to dissuade piracy so I thought you'd want to know."
Q. And do you know Mr. Frank?



A. Yes.
Q. Who is he?
A. He's an investor.
Q. And he's a CapForum subscriber?
A. He was. Unfortunately, as a result of potentially getting involved in this litigation, he ended up not being at Fort Baker anymore, partly because Market Securities tried to punish him for coming forward and explaining that they were stealing from us.
Q. Can you explain that a little bit more? What did Market Securities do towards Mr. Frank?
A. Well, there were a series of -- you know, he called me and wanted to see what was going to happen with Market Securities. And I told him we were going ahead with litigation, to read the complaint. It was very detailed and it sounded like his employer was putting on -- pressure on him to put pressure on me to settle. He made it clear that Market Securities was threatening to fire him as a subscriber. And I found out from -- that there were emails, that Market Securities was going to great

[redacted]

because of the alleged infringement by either BTG or Market Securities?
A. I don't know specifically if that was the only reason but we've had I would say -- I can say with absolute certainty that we have had significant harm to the business either by not getting new subscriptions or people cancelling because they could -- they had a means of getting it illegally, these summaries.
Q. Do you know of any specific subscriber who canceled because they were getting --
A. I didn't --
Q. Hold on. Because they were getting information from Market Securities about a Capitol Forum publication?
A. You would have to ask Joseph. I do not handle that type of granular rationale behind cancellations.
(Exhibit No. 7 was marked for identification.)
BY MR. DORNBERGER:
Q. Okay, Mr. Downey, you've been handed



what's been marked Exhibit Number 7 by the court reporter. This is another email thread. We're going to start with the Bates Number of the first page TCF000033. Do I have that right?
A. Yes.
Q. Okay. And let's go to the email that starts at the middle of page 2 and goes on to page 3. This is from Mr. Treacy to several folks including you dated December 7, 2021, right?
A. Yes.
Q. And at a certain point in time, Capitol Forum sent Market Securities a demand letter regarding the alleged infringement, right?
MR. WILLIAMS: Can you -- a demand letter? Cease and desist?
BY MR. DORNBERGER:
Q. Or cease and desist.
A. Yes.
Q. Some type of legal communication from your lawyer?
A. Yes. Yes.
Q. At some point, Capitol Forum sent a cease



and desist letter?
A. Correct.
Q. And I believe that was in the end of October of 2021.
MR. WILLIAMS: Yep.
BY MR. DORNBERGER:
Q. So this email in December 7th of 2021 is after you sent the cease and desist?
A. Correct.
Q. Can you agree with me there?
A. Yes.
Q. And what does Mr. Treacy say in this email?
A. "Hi, guys. This is one of the guys I assume was on the Market Securities distro list. Seems this continues to happen however not sure if this time it's from Market Securities or from someone else (either a sub, another IB/BD, or another news service). I know there's not much we can do about our headlines being shared (if it's from current subs) however I'd be in favor of contacting all our subs (maybe after the new year) and reiterating our



policy about not sharing our work or headlines with anyone outside of their firms. I'm probing him as much as I can without sounding like a detective. I'll see if I can get him" -- "I'll see if can get him to divulge additional info on this."
Q. What is the subject of his email?
A. "Headlines still being shared."
Q. Okay. So Mr. Treacy looks like received information from a Capitol Forum subscriber, right?
A. Yes. No, no. No, this is -- I don't think so. I think this is a prospect who Matt is trying to sell a subscription to who asked him -- oh, wait.
Q. Well, let me just ask a different question.
A. Actually, I think it's -- anyway, I think it's a prospect, not a subscriber but --
Q. Do you know -- and I'm going to butcher his first name, Ouachel Meskine at Mint Capital? Do you know who that is?
A. No.
Q. Do you know if Mint Tower Capital is a

MR. WILLIAMS: Facts? New facts? An expert report is going to be full of things. Now, you've had the opportunity to ask about it. Go seek your sanctions.

MR. DORNBERGER: If I have to come back for another deposition --

MR. WILLIAMS: Fine, fine.

MR. DORNBERGER: -- the court reporter, the videographer have seat fees, they have hourly fees, we have travel fees to get here to D.C. We offered to try to reschedule this for you to produce documents. You haven't produced the documents. So, yes, I will seek sanctions if I have to come back here for another deposition.

MR. WILLIAMS: Let me be square. We've produced all the documents you've asked for. You hounded me all last week to produce documents. We ran overtime at Capitol Forum producing documents so you wouldn't have an excuse to postpone these depositions. I have given you everything you've asked for. All right. Thank you very much.

MR. DORNBERGER: Okay. Now we can go off.

Page 150

THE VIDEOGRAPHER: The time is 1:37 p.m. This concludes today's deposition.

We're off the record.

(Whereupon, at 1:37 p.m., the taking of the instant deposition ceased.)

Page 151

CERTIFICATE OF REPORTER

UNITED STATES OF AMERICA ) ss.:
DISTRICT OF COLUMBIA )

I, MARY GRACE CASTLEBERRY, RPR, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties for the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

July 16, 2025

Notary Public in and for
The District of Columbia

My commission expires: 07/14/2026

Page 152

CERTIFICATE OF REPORTER

UNITED STATES OF AMERICA ) ss.:
DISTRICT OF COLUMBIA )

I, MARY GRACE CASTLEBERRY, RPR, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties for the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

Notary Public in and for
The District of Columbia

My commission expires: 07/14/2026